# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

JACK GROSS,

      Plaintiff,

      v.

FBL FINANCIAL GROUP, INC.,

      Defendant.

\* CIVIL NO. 4:04-CV-60209-TJS
\*
\*
\*
\* **ORDER ON DEFENDANT'S**
\* **RENEWED MOTION FOR**
\* **JUDGMENT AS A MATTER OF**
\* **LAW, OR IN THE ALTERNATIVE,**
\* **MOTION FOR NEW TRIAL**
\*

Before the court is Defendant's Renewed Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial (Clerk's No. 134). Defendant requests judgment as a matter of law under Federal Rule of Civil Procedure 50, or in the alternative, a new trial under Rule 59. For the reasons that follow, the motion is denied.

## I. BACKGROUND

In his complaint (Clerk's No. 1), plaintiff Jack Gross alleges FBL Financial Group, Inc. ("FBL") discriminated against him because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, and the Iowa Civil Rights Act, Iowa Code Chapter 216. Specifically, Gross claims he was demoted because of his age in January 2003, when he was 54 years old.

A jury trial was held from October 31 through November 4, 2005. At the close of evidence, FBL submitted a motion for judgment as a matter of law which was denied by the court. (*See* Clerk's Nos. 117-19.) The jury returned a verdict in favor of Gross and judgment was entered against FBL for the total amount of $46,945. (*See* Clerk's Nos. 125-26.)

Under the present motion, FBL renews its motion for judgment as a matter of law and argues that the evidence was legally insufficient for any reasonable jury to have found FBL intentionally discriminated against Gross based on his age.  In the alternative, FBL contends it is entitled to a new trial because the court excluded certain testimony by a witness and because the verdict, including the damage award, was against the clear weight of the evidence.

## II. ANALYSIS

Federal Rule of Procedure 50(a) provides, in part, as follows:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).  If the court denies such a motion, as in this case, the movant may renew its request for judgment as a matter of law and may, alternatively, request a new trial under Rule 59. Fed. R. Civ. P. 50(b).  In ruling on a renewed motion after a verdict is returned, the court may allow the judgment to stand, order a new trial, or direct entry of judgment as a matter of law. *Id.*

### A.  Defendant's Motion for Judgment as a Matter of Law

### 1. Standard for Judgment as a Matter of Law

A motion for judgment as a matter of law presents a legal question for the court: "'[W]hether there is sufficient evidence to support the jury's verdict.'" *Jones v. Swanson*, 341 F.3d 723, 731 (8th Cir. 2003)(quoting *White v. Pence*, 961 F.2d 776, 779 (8th Cir. 1992)).

As instructed by the Supreme Court, "in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).  The court views

> the "evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility."  The legal standard requires 1) all direct factual conflicts must be resolved in favor of the plaintiff, 2) all facts in support of the plaintiff that the evidence tended to prove must be assumed, and 3) the plaintiff must be given the benefit of all reasonable inferences.  A grant of judgment as a matter of law is proper only if the evidence viewed according to this standard would not permit "reasonable jurors to differ as to the conclusions that could be drawn."

*Jones*, 341 F.3d at 731 (citations omitted);  *see also Reeves*, 530 U.S. at 150 ("the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence"); *Spencer v. Stuart Hall Co.*, 173 F.3d 1124, 1127-28 (8th Cir. 1999)(applying standards in ADEA case).

In this age discrimination case, FBL presumes Gross established a prima facie case. (*See* Defendant's Brief in Support of Renewed Motion for Judgment as a Matter of Law, or in the Alternative Motion for New Trial (Clerk's No. 140) p. 4.)  At trial, FBL presented evidence of a legitimate, nondiscriminatory reason for demoting Gross.  Consequently, the central issue is whether Gross presented sufficient evidence from which a reasonable jury could find that FBL's proffered explanation was a pretext for discrimination. *See Reeves*, 530 U.S. at 143 (applying *McDonnell Douglas* burden-shifting framework in ADEA case); *Tatom v. Georgia-Pacific Corp.*, 228 F.3d 926, 931 (8th Cir. 2000)(same).  As in all discrimination cases, the ultimate question is whether FBL intentionally discriminated against Gross. *See*

*Reeves*, 530 U.S. at 143, 153; *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 478 (8th Cir.

2004)(race discrimination case); *Tatom*, 228 F.3d at 931 (age discrimination case).

## 2. Summary of Evidence

Following the applicable standard, the court will briefly summarize the evidence

presented at trial in the light most favorable to Jack Gross.  He was born on June 13, 1948.

(Trial Tr. at 403.)  In 1971, he began employment with Farm Bureau operations in Iowa as

a multi-line claims adjuster in three southeast counties. (Tr. at 58, 403.)  As described by

Gross, he handled "auto collision claims, liability claims, hail claims, cattle in cornfield

claims, bodily injury, medical claims, everything that basically happened in those three

counties." (Tr. at 58.)   After working as a regional manager for a couple of years, he

voluntarily left his employment with Farm Bureau in 1978 and then returned as a claims

adjuster in 1987. (Tr. at 58-59, 61-62, 403.)  His supervisor was Tom Eppenauer who was

a division claims manager. (Tr. at 63, 284.)

In 1990, Gross was promoted to a division claims manager in the West Des Moines

claims office. (Tr. at 62.)  At the time, the division claims manager was responsible for about

eight to nine adjusters and a small clerical staff. (Tr. at 63.)  In 1993, Gross moved to the

main office and became a regional coordinator and training director. (Tr. at 65-66.)

Eppenauer had been promoted to claims vice president and remained Gross' supervisor. (Tr.

at 66, 284.)

In 1994, Gross became director of claims administration. (Tr. at 66.)  He had several

units reporting to him and worked on a companywide project to make it as efficient as

possible. (Tr. at 66-67.)  In 1997, he was promoted to assistant claims manager. (Tr. at 67.)

He had several functional areas reporting to him and worked extensively on a package policy project for the company. (Tr. at 67-68.)  The managers which reported to him included those for the workers' compensation, subrogation, first notice of loss, medical supervision, and physical damage departments. (Tr. 69-70.)

In January 1999, Gross was promoted to claims administration vice president. (Tr. at 71-72.)  According to Gross, his job did not change much because he continued to be responsible for functional areas and continued to develop programs including the use of a debit card to pay claims. (Tr. at 72.)  Throughout this time, Eppenauer remained Gross' supervisor and had recommended his promotions. (Tr. at 72, 288.)  Gross had consistently received high scores on his evaluations by Eppenauer and has never been disciplined as a Farm Bureau employee. (Tr. at 77, 230.)

In August 2000, Eppenauer was demoted by the company's chief operating officer, Barbara Moore, to the position of claims training administrator and no longer had supervisory authority over Gross. (Tr. at 289.)  Eppenauer described his new position as follows: "I had supervisory authority over no one.  I had virtually no duties." (Tr. at 289.)  He retired in December of 2003. (Tr. at 279.)

Andy Lifland replaced Eppenauer as vice president of claims for the Iowa Farm Bureau in August 2000 and became Gross' supervisor. (Tr. at 403, 413.)  Lifland had been the vice president of claims for Farm Bureau operations in Arizona and New Mexico. (Tr. at 83, 413.)  Moore had also worked in the Arizona and New Mexico operations and hired Lifland for the Iowa position. (Tr. at 640, 647.)

In January 2001, Gross was demoted to the position of claims administration director as part of a reorganization of the claims department. (Tr. at 89-90.)  He viewed this position as a demotion because his points under the company's Hay system for salary grades were reduced. (Tr. at 89-90.)  His job responsibilities did not change. (Tr. at 90, 469-70.)

Gross received lower scores on his evaluations from Lifland than he had previously received from Eppenauer on prior evaluations. (Tr. at 110-11, 428, 432-33.)  Gross believed that Lifland's evaluations were not fair because Lifland never spoke to him about his work or progress. (Tr. at 110-15.)  In Gross' words, he had "never seen a worst example of a manager than Mr. Lifland." (Tr. at 106.)

On January 1, 2003, the Iowa Farm Bureau operations merged with the Kansas and Nebraska Farm Bureau operations. (Tr. at 121, 403-04.)  As part of the merger, the claims department was restructured by Lifland and Steve Witmuss, who was from the Nebraska Farm Bureau and became the regional claims vice president and second in command below Lifland. (Tr. at 444-45, 529-30.)  Witmuss explained the restructure process as follows:

> [W]e were trying to find positions for everybody, what we thought best suited their talents.  You know, when you have – when you're trying to put three companies together – you know, in a claims department, you have the support staff, you have the adjusters, and you have the district claims managers, and then you move up the ladder.  And we still have the claims, so pretty much from the district claims level manager down, you know, we still needed those people and their jobs didn't change significantly.
>
> What happens is the people above that level, you have more people than you have jobs for the new organization, and so you're trying to find people to fit in – I mean, it's also a nice opportunity to go and review people and make sure you think they're where they should be.

(Tr. at 532.)

As part of the restructuring, Gross was demoted to the position of claims project coordinator. (Tr. at 403.)  According to Gross, he was told in a meeting with Lifland and Wittmuss that "they decided [his] talents were better suited to this new job." (Tr. at 123.) Lifland and Witmuss did not indicate that the demotion was based on any problems with Gross' performance as claims administration director. (Tr. at 127.)   Lifland told Gross he would be working with special projects. (Tr. at 124.)  He was instructed to continue with the projects he was currently working on. (Tr. at 127-28.)  Some time after the meeting, Gross received a job description for his new position as claims project coordinator. (Tr. at 124.)

As for his former claims administration director position, Gross was informed during the meeting "that they were going to create a claims administration manager and that most of [his] job would be going to Lisa Kneeskern." (Tr. at 126.)  Kneeskern had been a subrogation supervisor who reported to Gross. (Tr. at 126.)  At the time, Gross was 54 years old and Kneeskern was in her early forties. (Tr. at 126-27.)

On April 1, 2005, Wittmus became Gross' immediate supervisor. (Tr. at 403.)  Gross remains employed by FBL as a claims project coordinator. (Tr. at 403.)

### 3. Legal Analysis

FBL argues that no reasonable juror could have found that FBL intentionally discriminated against Gross based on his age.  FBL asserts that Gross' reassignment in 2003 occurred because Farm Bureau operations in Kansas and Nebraska merged with the Iowa operation.  According to Lifland and Wittmuss, Gross was assigned to the projects coordinator position because they believed it was the best fit for Gross' strengths. (Tr. at 123, 437-38, 532-33, 558.)

FBL's decision to reorganize its operations and reassign employees into different positions, by itself, does not violate either federal or state law. Employers are free to make their own business and personnel decisions so long as they do not involve discrimination. *See*, *e.g.*, *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 956 (8th Cir. 2001)("'A company's exercise of its business judgment is not a proper subject for judicial oversight.'"); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)("'[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.'"); *Hanebrink v. Brown Shoe Co.*, 110 F.3d 644, 646 (8th Cir. 1997)("This court, moreover, may not second-guess an employer's personnel decisions, and we emphasize that employers are free to make their own business decisions, even inefficient ones, so long as they do not discriminate unlawfully."). Accordingly, FBL presented a legitimate, nondiscriminatory reason for demoting Gross.

The jury found, however, that Gross' age was a motivating factor in FBL's decision. (*See* Final Instruction No. 11; Verdict Form.) FBL challenges the verdict by noting there was no evidence that any of Gross' superiors, including Lifland, Wittmuss and Moore, made any comments about his age. (*See* Tr. at 248-49, 441-42, 445.) All three individuals explicitly denied that age was a consideration in the decision to place Gross in the project coordinator position. (Tr. at 412, 533, 570, 643.) Despite the lack of such direct evidence of discrimination, the court believes there was ample circumstantial evidence presented during

trial for the jury to conclude that FBL intentionally discriminated against Gross based on his age.

Gross testified that his demotion was based on his age for the following reasons:

> Well, No. 1, in Kansas everybody over 50 got bought out. They just didn't want over 50 people down there. All of the people in the Iowa operation who had been there a significant amount of time and had, you know, achieved a degree of success were getting paid well. We were all pretty much taken down at the same time, not just based on performance. The only common thread was age. And there was a merger and there was a reorganization. There's another reorganization this year, two years later, and it looks like again 55 people are going to get hurt by it.

(Tr. at 181-82.) Gross further testified: "My job was – that I had been well qualified for and handling at a very high level was taken away and given away to a much younger subordinate who had less experience and qualifications." (Tr. at 249.)

Contrary to FBL's argument, an inference of age discrimination is raised by the decision to place Kneeskern in the claims administration manager position instead of Gross. First, there was ample evidence for the jury to find that Gross was highly qualified for the position. Gross testified that the claims administration manager position was functionally the same job he was performing before the merger. (Tr. at 129.) As stated by Gross, "some of the reporting changed, but the day-to-day real job is the same." (Tr. at 129.) Gross was never told by Lifland or Witmuss that he was unable to perform any portion of the position. (Tr. at 135.)

Second, there was ample evidence for the jury to find that Kneeskern was not qualified for the position or, at the least, was far less qualified than Gross for the position. Gross had supervised Kneeskern for several years before the merger. (Tr. at 130-31.) During his testimony, Gross compared Kneeskern's work experience and qualifications to his and the qualifications for the claims administration manager position. (Tr. 131-34.)

In addition, Eppenauer stated explicitly that Kneeskern was not qualified for the job. (Tr. at 333, 349.)  He testified that, while she was a "very good employee," her experience was limited to the subrogation department. (Tr. at 327.)  As noted by Eppenauer, "[s]he did not have any field adjusting experience.  She hadn't worked bodily injury claims or total loss automobile claims or work comp or any other arena of the claim department." (Tr. at 327.)  In Eppenauer's opinion, Gross was much more qualified for the position than Kneeskern. (Tr. at 353-54.)  In regard to Gross' job knowledge, Eppenauer testified as follows:

> It's probably as high a knowledge as we had in the department overall.  There were certain areas he had extremely good insurance knowledge.  There's some areas he didn't work every day which he would not have been as good as some others, but he just had superb knowledge in a number of areas.

(Tr. at 286.)  When asked about Gross' interaction with the employees he supervised, Eppenauer responded, "[h]e did a great job." (Tr. at 286.)

Based on this testimony and the job descriptions admitted into evidence, the jury could have reasonably concluded that Gross was far more experienced and qualified than Kneeskern for the claims administration manager position.

An inference of discrimination is also raised by the fact that Gross was never even provided an opportunity to apply for the claims administration manager position. (*See* Tr. at 135.)  As set forth above, there was sufficient evidence he had been performing the same duties for years and was far more qualified than the younger, former subordinate who was given the job.  Yet, he was not provided an opportunity to apply for the position or even asked by Lifland or Witmuss regarding the appropriateness of Kneeskern's promotion into the position. (Tr. at 134-35.)  In contrast, Moore, the chief operating officer, testified that she had to reapply for her position. (Tr. at 654.)

There was also sufficient evidence for the jury to reasonably conclude that FBL's explanation for demoting Gross was false and a pretext for discrimination.  As explained by Lifland and Wittmuss, Gross was placed into the claims project coordinator position because it was a good fit for his strengths and weaknesses.  Moore similarly agreed that the object was to find positions for people to fit within the new structure. (Tr. at 658.)

Wittmuss conceded, however, that at the time the decision was made the project coordinator position was ill-defined and did not have a job description or specifically assigned duties. (Tr. at 557-58.)  Gross also testified that the position "was not really well defined. They said just keep on working on the projects that you're working on, which I did, but they didn't last very long." (Tr. at 167.)  Consequently, the jury could have reasonably found the stated reason for Gross' demotion was not credible because there was no defined position for Gross to "fit" into.  As noted by the Supreme Court, "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147.

FBL argues that uncontradicted evidence was presented which showed that Kneeskern was qualified for the claims administration manager position and that Gross was a good fit for the claims project coordinator position.  FBL is correct that Gross is not entitled to "'the benefit of unreasonable inferences, or those at war with the undisputed facts.'" *Knutson v. Ag Processing, Inc.*, 394 F.3d 1047, 1050 (8th Cir. 2005)(quoted citation omitted).  Contrary to FBL's argument, however, the court does not believe the evidence supporting FBL's defenses is undisputed or uncontradicted.  Instead, the jury had reasonable grounds to question the

credibility of FBL's witnesses because of inconsistencies and contradictions in their testimony.

For example, Gross testified that the claims administration manager position given to Kneeskern was functionally the same job he was performing before the merger. (Tr. at 129.) Wittmuss also testified that the positions were basically the same and described them as "very similar jobs." (Tr. at 557.) Lifland, on the other hand, testified that "as it existed prior to the merger, [Gross'] position went away." (Tr. at 445.)

Lifland also testified that Kneeskern had made a complaint to him about Gross. (Tr. at 438.) Kneeskern contradicted Lifland's testimony while being cross-examined:

> Q. We've heard some discussion about concerns that you expressed to Mr. Lifland about Mr. Gross. You had a very good working relationship with Mr. Lifland; correct?
>
> A. Yes.
>
> * * *
>
> Q. You had no problems going to talk to Mr. Lifland about concerns that you had about Mr. Gross; correct?
>
> A. I don't recall ever approaching Andy talking about any concerns about Mr. Gross.
>
> Q. You never complained about Mr. Gross to Mr. Lifland?
>
> A. Complained?
>
> Q. Complained or expressed concerns or anything of that type?
>
> A. I think that's a pretty strong word. No.

(Tr. at 582-83.)

Based on the inconsistencies and contradictions presented by FBL's own witnesses, the jury could have reasonably decided to not believe a part, or all, of their testimony including the reason given for demoting Gross. *See Reeves*, 530 U.S. at 147 ("factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt'")(quoted citation omitted); *Spencer*, 173 F.3d at 1128 ("Where conflicting evidence is presented at trial, it is the jury rather than this court which assesses the credibility of the witnesses and decides which version to believe.").

An inference of age discrimination was also raised by evidence regarding the demotions of other employees in connection with the 2003 merger. (*See* Tr. at 170-73, 181-82; Plaintiff Ex. 15.) Eppenauer testified that

> [a] number of senior or tenured employees with a number of significant years of service in at Farm Bureau were isolated and demoted. And when that is done, their pension is frozen, and essentially their ascent into the company – or into other positions in the company is frozen, and all of those individuals are near the age 50 and above. To me, that's age discrimination.

(Tr. at 365.) Although FBL argues at length about the specific circumstances of the other demoted employees, those issues can only be resolved by weighing or evaluating the evidence or considering questions of credibility. Those are matters for the jury. *Reeves*, 530 U.S. at 150 (the court "may not make credibility determinations or weigh the evidence"). Giving Gross the benefit of all reasonable inferences, however, the court finds the jury could have reasonably relied on this evidence to conclude that Gross' demotion was motivated by age.

In sum, after viewing the testimony and documents submitted in the light most favorable to Gross, this court finds sufficient evidence exists to support the jury's verdict. FBL's request for judgment as a matter of law under Rule 50 is, therefore, denied.

### B.  Defendant's Alternative Motion for New Trial

Federal Rule of Civil Procedure 59 provides, in part, that

> [a] new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . .

Fed. R. Civ. P. 59(a)(1).  FBL believes it is entitled to a new trial for two reasons.  First, FBL asserts that the court's exclusion of certain testimony by Andy Lifland was erroneous.  Second, FBL contends the jury's verdict, including the damage award, was against the clear weight of the evidence.  The court disagrees on both points.

### 1. Exclusion of Testimony

FBL argues that the court's exclusion of evidence relating to comments coworkers made to Andy Lifland about Gross was erroneous.  The court excluded certain testimony by Lifland because it was inadmissible hearsay.  Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

The first portion of Lefland's testimony at issue states as follows:

> Q. At some point did anyone who was in your chain of command report to you that Jack Gross and Tom Eppenauer were undermining you?
>
> A. Yes.
>
> Q. Just tell the jury about that briefly.
>
> MS. TOWNSEND: Your Honor, I'm going to object to anything that calls for hearsay.
>
> THE COURT: Sustained.

MR. HARTY: Your Honor, if I may, these evaluations have been called into question. I'm not offering it for the truth of the matter asserted but, rather, for the fact that Mr. Lifland, the evaluator, heard it.

THE COURT: I'll persist in my ruling.

(Tr. at 433.) Lifland later testified as follows:

Q. And, again, the 2003 decision to place Jack Gross into the project coordinator position, before that time had you received any complaints from coworkers concerning whether they really wanted to work with Mr. Gross?

A. I had, yes.

Q. . . . . Did you take that into account when you decided to assign Mr. Gross to the projects position as opposed to some position where he would be managing people?

A. I considered all of those factors, but I recognized that one of Jack's real strong points was handling projects. He was handling projects in his claims administration position as well. Jack excelled at projects. That was a real strong point. And so in our way of thinking, this claims project coordinator position was perfect for jack, absolutely perfect. It's his strong point.

Q. At some point did you reach the conclusion that Jack Gross just didn't like you?

A. I did, yes.

Q. How did you react to that?

A. Well, I mean, I'm disappointed. It's not a popularity contest. You know, deep down, I want people to like me, but the company could do very well even if people didn't like me as long as they did the job that they were supposed to do. But, sure, I want people to like me, but apparently Jack did not.

Q. Before you actually assigned Mr. Gross to the projects position as opposed to managing people, did Lisa Kneeskern complain about him?

A. I recall her making - -

MS. TOWNSEND: Your Honor, I'm going to object.

Q.  (BY MR. HARTY) We're probably going to get an objection.  If you would just respond whether or not you received a complaint.

A.  Yes.

Q.  Did you take that complaint into account when you placed Mr. Gross into the projects position in 2003?

A.  Yes.

Q.  Did Steve Liebbe complain about Mr. Gross?

A.  Yes.

Q.  Did Gregg Johnson complain about Mr. Gross?

A.  Yes.

Q.  Did Steve Wittmus actually make some observations about Mr. Gross?

A.  Yes.

Q.  Did you take all those things into account when you made the decision to place Mr. Gross in the projects coordinator position?

A.  Yes.

Q.  Tell us what Mr. Liebbe said to you.

MS. TOWNSEND: Objection, hearsay.

THE COURT: Sustained.

(Tr. at 437-39.)

As reflected by the record, the testimony objected to by counsel and excluded by the court during Lifland's trial testimony was (1) the substance of the report that Gross and Eppenauer were undermining Lifland and (2) the substance of the complaint made by Liebbe. Lifland was not asked, in the presence of the jury, about the substance of complaints by Kneeskern, Johnson or Wittmus.  Although Gross' counsel objected as Lifland began

answering the question whether Kneeskern ever made a complaint, FBL's counsel proceeded before the court ruled on the objection. Because the substance of both the report and Liebbe's complaint were statements made out of court and, in the court's opinion, were offered to prove the truth of the matter asserted, the proffered testimony was properly excluded as inadmissible hearsay evidence. *See* Fed. R. Evid. 801(c); *Chadwell v. Koch Refining Co.*, 251 F.3d 727, 731 (8th Cir. 2001).

In its brief, FBL notes that federal courts have repeatedly allowed employers to present testimony concerning comments or reports that a manager took into account when making the employment decision at issue. *See Crimm v. Missouri Pacific R.R. Co.*, 750 F.2d 703, 709 (8th Cir. 1984)(affirming admission of documents offered to demonstrate that employer had conducted an investigation and to disclose information that employer had relied on in making decision); *Cameron v. Community Aid For Retarded Children, Inc.*, 335 F.3d 60, 66, n. 2 (2nd Cir. 2003)(complaints by various employees against plaintiff are not hearsay because the statements are not used to prove truth of matter asserted but to establish decision-maker's state of mind); *McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1349 (5th Cir. 1985)(holding transcript of appeal hearing before Board of Trustees was properly admitted for limited purpose of showing motive and intent of Board in deciding not to renew plaintiff's employment contract); *McKenna v. Weinberger*, 729 F.2d 783, 792 (D.C. Cir. 1984)(holding supervisors' testimony about complaints of plaintiff's co-workers was not hearsay because it "was offered to illuminate their motives and actions as supervisors, not to prove that the co-workers had valid complaints").

The court recognizes and agrees with the principle set forth in those cases but does not believe the record supported its application at the time the testimony was presented. Again, the only testimony excluded was the substance of the report and Liebbe's statements to Lifland. Based on the record at the time, the court believes there was an insufficient foundation to determine that the proffered testimony was, in fact, complaints that Lifland relied upon in making decisions relevant to this case.

Later in the trial, Wittmus was asked if he ever heard concerns from coworkers about whether they wanted Gross on their project teams, and he responded as follows:

> Well, as we went on with the – with working, you know, I had – we had regional claims managers that reported to me and we met and we tried to find sometimes projects for different people, and there was some concern about Jack working on some of the projects.

(Tr. at 535-36.) Wittmus then identified by name five individuals who raised such concerns. (Tr. at 536.) Wittmus was not asked, however, to discuss the substance of their concerns in any detail. No objections were made by Gross' counsel during this testimony.

Subsequently, FBL made the following offer of proof outside the presence of the jury:

> Q. Mr. Lifland, in making the decision to place Jack Gross in the project coordinator position, did you rely upon information that you had received from others in the Farm Bureau organization?
>
> A. Yes.
>
> Q. Did you take into account concerns or complaints that had been expressed to you about Mr. Gross?
>
> A. Yes.
>
> Q. Would you please tell the Court the nature of those concerns or complaints.
>
> A. There were a number of complaints. Some of them discussed the fact that Jack was - - had his own agenda, had his own best interests at heart as opposed

to the company's best interests; that he was not a people person, was not well-liked.  Comments were made that he gave no guidance to his subordinates. There were a number of comments.

Q. Did you take these comments into account in making the January 1, 2003 placement?

A. Yes.

Q. Were these comments made by more than one of your coworkers?

A. Yes.

Q. As we sit here today, do you know how many people made comments of that nature?

A. Directly to me, probably four, five, six.

Q. Can you identify those people, please.

A. Yes.

Q. Will you do so.

A. Steve Wittmus, Lisa Kneeskern, Steve Liebbe, Greg Johnson, Lynn Miller, John Czerwonke.

Q. Let's start at the end.  What did Mr. Czerwonke tell you?

A. Jack was not a team player.  He was out for himself.

Q. How about Mr. Miller?

A. The same thing.

Q. How about Miss Kneeskern?

A. That he offered no guidance in terms of supervision.

Q. And Mr. Wittmus?

A. Probably all of those things.  And Wittmuss also heard from other individuals, so maybe – if I'm allowed to say that –

Q. If he told you –

A. Yes.

Q. - what he had heard from others and you took it into account in making that decision, yes, please explain what he told you.

A. He told me that his regional claim managers had commented directly to him that they did not want Jack on projects that they were involved in because he was very negative and brought everybody down.

Q. Let's make sure – I want to make sure that we're limiting your testimony to things that you heard before January 1, 2003, before the merger.

A. Not all of those were prior to the merger.

Q. Can you just identify for the Court which of those comments were made prior to the merger.

A. Mr. Liebbe and Miss Kneeskern, their comments about no guidance, no supervision were made prior to the merger.

Q. What about Mr. Miller or Mr. Czerwonke?

A. I would say that both of them commented prior to the merger.

MR. HARTY: Thank you.  Your Honor, that is the testimony we would have offered had the Court not sustained plaintiff's counsels' objection.

(Tr. at 538-41.)

After the offer of proof, FBL did not request the court to reconsider its prior ruling or seek to have Lifland testify again.  The court also notes that FBL's offer of proof did not specifically address the excluded testimony regarding the substance of the report to Lifland "that Jack Gross and Tom Eppenauer were undermining" him.  Consequently, there was no evidence for the court to determine whether the substance of the report was being offered for the truth of the matter or was being offered as information relied upon by Lifland in making a personnel decision regarding Gross.  Although counsel referred to evaluations in response

to the objection made before the jury, Lifland himself never testified, either before the jury or during the offer of proof, as to any connection between the report and his evaluations of Gross. Without the substance, source and specifics of the report, the only conclusion the court could, and did, make was that the proffered testimony was inadmissible hearsay.

As for Liebbe's comment, Lifland again was not asked directly regarding the substance of his complaint. Instead, Lifland referred to Liebbe in response to counsel's inquiry as to which comments were made prior to the merger, stating as follows: "Mr. Liebbe and Miss Kneeskern, their comments about no guidance, no supervision were made prior to the merger." (Tr. at 540.) Consequently, even if FBL had asked the court to reconsider, there was still insufficient foundation as to the actual substance of Liebbe's comments to Lifland.

There was also insufficient foundation for the court to determine when Wittmuss may have communicated either his own concerns or those of coworkers to Lifland. Wittmuss did testify, after the offer of proof, that the concerns he had heard about Gross from coworkers were made after Gross' demotion. (Tr. at 553-54.) Consequently, those comments would not have been relied on by Lifland and are irrelevant to the decision to demote Gross.

Even if the court erred in its ruling, FBL must establish that it was prejudiced by the exclusion of the testimony. *See Keisling v. SER-Jobs for Progress, Inc.*, 19 F.3d 755, 762 (8th Cir. 1994); *cf. Paul v. Farmland Indus., Inc.*, 37 F.3d 1274, 1277 (8th Cir. 1994)("[A] jury's verdict will not be disturbed absent a showing that the evidence was so prejudicial as to require a new trial which would be likely to produce a different result."); *Spencer*, 173 F.3d at 1130 ("We will only disturb a jury's verdict if the evidence is so prejudicial that its exclusion would likely produce a different result in a new trial.").

Based on FBL's offer of proof, the substance of the evidence FBL intended to offer was that Lifland heard comments prior to his decision from Czerwonke and Miller that Gross "was not a team player" and "was out for himself", and that he heard a complaint from Kneeskern that Gross "offered no guidance in terms of supervision." Even if FBL had offered this evidence, the court finds minimal, if any, prejudice to FBL if this limited testimony had in fact been excluded.

It is noteworthy that Lifland was allowed to testify that he did receive complaints about Gross and considered the complaints when deciding to place Gross in the projects coordinator position. Testimony was also elicited from Lifland that the complaints he received "were from coworkers concerning whether they really wanted to work with Mr. Gross." Lifland also confirmed that he heard a report "that Jack Gross and Tom Eppenauer were undermining" him. Consequently, the jury heard evidence regarding the general nature of the comments made and considered by Lifland. In the court's view, the additional testimony FBL believes it should have been able to present would have had minimal impact on the jury's decision in this case.

The court agrees with FBL's contention that the court's exercise of discretion in excluding evidence should not unfairly prevent a party from defending itself. In this case, however, FBL was not prevented from offering the evidence through other witnesses. As conceded by FBL in its brief, other witnesses could have testified about the complaints they made to Lifland. (*See* Defendant's Brief in Support of Renewed Motion for Judgment as a Matter of Law, or in the Alternative Motion for New Trial (Clerk's No. 140) at p. 34, n. 17.)

Wittmuss, Kneeskern, and Miller all testified before the jury after the offer of proof. None, however, were asked by FBL's counsel to discuss the substance of the complaints or comments referred to by Lifland. Miller was not asked any questions regarding whether he made any complaints about Gross to Lifland. Although Wittmuss did testify that complaints were made in general terms, he was not asked to discuss the substance of the coworkers' concerns in any detail.

Kneeskern was also not asked any questions during direct examination by FBL's counsel regarding any complaints she made to Lifland. On cross examination, however, she denied making any complaints to Lifland about Gross. (Tr. at 583.) She stated: "I don't recall ever approaching Andy talking about any concerns about Mr. Gross." (Tr. at 583.) FBL's counsel did not ask any questions regarding the matter during the redirect examination.

Given the repeated opportunity FBL had in presenting the evidence through these witnesses after the offer of proof was made, the court finds no basis to conclude that FBL was unfairly prevented from presenting the evidence.

## 2. Weight of the Evidence

The "court may grant a new trial on the basis that the verdict is against the weight of evidence, if the first trial results in a miscarriage of justice." *Shaffer v. Wilkes*, 65 F.3d 115, 117 (8th Cir. 1995).

> In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence - it can "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."

*White*, 961 F.2d at 780 (quoted citation omitted). The Eighth Circuit has noted, however, that the district court's discretion is not boundless:

> the district court is not "'free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'"

*Id.* (quoted citations omitted). Ultimately, the "court must determine if there will be a miscarriage of justice if the jury's verdict is allowed to stand." *Dominium Mgmt. Servs., Inc. v. Nationwide Housing Group*, 195 F.3d 358, 366 (8th Cir. 1999).

Relying on its own reading of the documents and testimony presented at trial, the court finds that the jury's verdict is not against the weight of the evidence. Instead, the court believes there was ample evidence to justify the conclusion that FBL intentionally discriminated against Gross based on his age. Different inferences could have been drawn, but the court finds no reason to believe that the jury's verdict results in a miscarriage of justice.

**3. Damage Award**

FBL contends that the damages awarded by the jury is against the clear weight of the evidence. The jury awarded Gross the amount of $20,704 for lost past salary and $26,241 for lost past stock options. (Verdict Form (Clerk's No. 125).) The jury awarded no damages for emotional distress. FBL argues that no witness presented testimony that would support a finding of $20,704 for lost past salary damages.

Gross' expert witness testified that the total loss in salary and bonus for the back pay period was "approximately $19,800." (Tr. at 384.) In closing argument, Gross' counsel referenced this specific amount. Counsel told the jury: "Mr. Ryerson testified that his lost wages were $19,800. There's really no dispute about that." (Tr. at 706.)

In his resistance, Gross asserts that the award of lost past salary was appropriate and should not be remitted. The Eighth Circuit has instructed that this "court should grant remittitur only when the award is so excessive as to shock the court's conscience." *Triton Corp. v. Hardrives, Inc.*, 85 F.3d 343, 347 (8th Cir. 1996)(citing *Norton v. Caremark, Inc.*, 20 F.3d 330, 340 (8th Cir. 1994)); *see also American Business Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1146 (8th Cir. 1986)("A district court should grant remittitur only when the verdict is so grossly excessive as to shock the court's conscience.") Here, the court does not believe the damages awarded by the jury is so excessive as to meet this standard. The court also notes that FBL did not specifically request remittitur in its motion or supporting briefs. For those reasons, the court agrees that remittitur is not appropriate in this case.

The court also finds that the award of $20,704 by the jury for lost past salary is not against the clear weight of the evidence. The expert witness testified initially that Gross' lost salary is $20,704. (Tr. at 383.) The expert witness then deducted "approximately $900" based on his assumption that "the bonus and salary is all received throughout the year." (Tr. at 384.) The jury could have reasonably rejected the witness' assumption and found Gross was entitled to the full amount of $20,704.

### III. CONCLUSION

As stated by the Supreme Court, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves*, 530 U.S. at 153. After reviewing all of the evidence in the record, and drawing all reasonable inferences in favor of Gross, the court concludes there was sufficient evidence for the jury to find that FBL intentionally

discriminated against Gross based on his age.  The court further concludes that the exclusion

of certain testimony by Andy Lifland was not error or prejudicial to FBL.  After relying on

its own reading of the evidence, the court concludes that the jury's verdict is not against the

weight of the evidence or results in a miscarriage of justice.

Defendant's Renewed Motion for Judgment as a Matter of Law, or in the Alternative,

Motion for New Trial (Clerk's No. 134) is, therefore, denied and the judgment entered in

accordance with the jury's verdict shall stand.

IT IS SO ORDERED.

Dated June 23, 2006.

_____
THOMAS J. SHIELDS
CHIEF U.S. MAGISTRATE JUDGE